# AFFIDAVIT OF SPECIAL AGENT KEFALAS IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Christopher J. Kefalas, state:

## Introduction and Agent Background

1. I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice and have been so employed since 2015. I received a master's degree in Criminal Justice from Northeastern University in 2014 and a bachelor's degree in Criminology from Stonehill College in 2012. I am responsible for the enforcement of federal firearms, explosives, and narcotics laws. I am presently assigned to the Bridgewater Field Office, where I am one of a group of Special Agents who work with state and local law enforcement to uncover violations of laws specifically related to firearms trafficking, firearms possession by prohibited persons, use of firearms in furtherance of drug trafficking crimes, and the possession of illegal explosive devices in southeastern Massachusetts.

2. On October 17, 2019, the Court issued a complaint charging Alexander ESTEVAO with possession of two unregistered destructive devices, in violation of 26 U.S.C. § 5861(d), and with engaging in the business of dealing firearms without a license, in violation of 18 U.S.C. § 922 (a)(1)(A).

3. This affidavit is being submitted in support of an application for warrants to search electronic equipment, which includes two mobile phones and one digital video recorder (DVR) (collectively, "the equipment") that is in the possession of law enforcement investigators, as described in Attachment A. There is probable cause to believe that the equipment contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

4. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

**Probable Cause to Believe That Federal Crimes Were Committed**

5. On July 12, 2019, two ATF cooperating witnesses ("CWs") informed ATF, among other things, that an individual known to them as "Franca" was seeking to sell a Colt .45 caliber pistol for $1,200. The CWs said that "Franca" told them he could get as many pistols as they wanted and that they were new and in the box. The CWs provided cellular telephone number (774) 327-4789 for "Franca." The CWs provided a photograph of a Colt 1911-style firearm that "Franca" had sent by means of his cell phone. Investigators subsequently determined that "Franca" is ESTEVAO.

6. On July 25, 2019, the CWs spoke with ESTEVAO, who was utilizing the cellular telephone assigned number (774) 327-4789, about purchasing the firearm. ESTEVAO said that the firearm was a distance away and it would be hours before the transaction could take place. They ultimately arranged to conduct the transaction the following week.

7. On July 31, 2019, the ATF with the assistance of the Mashpee Police Department and New Bedford Police Department conducted a controlled purchase of one Colt, MKIV Series 70 Gold Cup National Match .45 caliber semi-automatic pistol bearing serial number 70N18382, as well as sixty rounds of .45 caliber ammunition, from ESTEVAO utilizing the ATF CWs. The primary CW utilized throughout this ATF investigation is a long-term ATF CW who has provided credible information and conducted transactions on the behalf of law enforcement leading to the issuance of search warrants and arrest warrants as well as the convictions of

numerous defendants in both state and federal court. This CW is currently receiving immigration and monetary benefits.

8. During the course of the controlled purchase, ESTEVAO was observed operating a red 2017 Mitsubishi Lancer bearing Massachusetts Registration 7JSY80 registered to ESTEVAO's girlfriend, Tina Linebaugh, to and from the buy location. ATF observed ESTEVAO as the lone operator of this vehicle. ESTEVAO sold the firearm to the ATF CWs for the sale price of $1,200.00. Although the address associated with ESTEVAO's Massachusetts driver's license and Linebaugh's car registration was an address in Teaticket, Massachusetts, the transaction took place within the residence located at 72 Pond Circle, Mashpee, Massachusetts.

9. This investigation remained open and on October 10, 2019, the ATF CW discussed in Paragraph 7 indicated that the CW had been in contact with ESTEVAO, who was seeking, in sum and substance, to sell two explosive type devices to the CW. ESTEVAO, while utilizing cellular telephone number (774) 327-4789, provided no further information to the CW relative to the make-up of the devices other than indicating that one of the devices would make a car into a convertible. This phone call was audio recorded and the parties spoke in Portuguese. The phone call was subsequently translated by a Brazilian Police Officer from the Barnstable Police Department. ESTEVAO also claimed to have the devices accessible to him and agreed to sell the devices for the sale price of $1,500.00 total. ESTEVAO sent the following address to the CW to conduct the transaction: "127 Marion Rd, Wareham, MA 02571." This is the address for a Shaw's Supermarket located near 174 Marion Road, Wareham, Massachusetts.

10. On October 11, 2019, ATF attempted to arrange through the CW the controlled purchase of

the two explosive type devices from ESTEVAO. The ATF CW placed a series of calls and text messages to ESTEVAO at cellular telephone number (774) 327-4789, with no response.

11. Intelligence led investigators to suspect ESTEVAO was staying at his mother's apartment, located at 23C West Bay Road in Osterville, Massachusetts.

12. On October 11, 2019, surveillance had already been established at 23C West Bay Road in Osterville, Massachusetts as of approximately 2:45 p.m. by ATF Special Agents/Task Force Officers and the Barnstable Police Department, among other law enforcement agencies. At approximately this time, ATF Special Agents/Task Force Officers and members of the Barnstable Police Department observed ESTEVAO leave 23C West Bay Road in Osterville, Massachusetts. ESTEVAO was walking quickly, looking in all directions, and talking on a cell phone. Agents and officers approached ESTEVAO and arrested him for state violations related to the possession and sale of the firearm and ammunition on July 31, 2019 in Mashpee, Massachusetts.

13. After the arrest, S/A Higgins read ESTEVAO the charges and provided Miranda warnings. ESTEVAO acknowledged his rights and immediately stated that he had marijuana in his left front pocket of his sweat pants. ESTEVAO next stated that he had "coke" in his right front sweat pants pocket. Incident to the arrest, officers recovered from ESTEVAO's right front pocket a plastic bag containing smaller plastic baggies of suspected cocaine packaged for sale (later weighed and found to have an approximate cumulative weight of 21 grams). S/A Higgins asked ESTEVAO about the substances within the baggies and ESTEVAO identified the substances as cocaine, which he intended to sell. Officers also seized two cellular telephones, one black Blade smartphone and a silver Motorola smartphone, from ESTEVAO's sweatshirt pouch. When asked if he had any guns, ammunition, or explosives in

the apartment, ESTEVAO denied this and stated he wanted a lawyer.

14. S/A Higgins advised ESTEVAO that investigators observed him exit the residence, walking quickly, while looking in all directions and on his cellular telephone. S/A Higgins told ESTEVAO that investigators believed he was en route to conduct a narcotics transaction. S/A Higgins further advised that, based upon these facts, law enforcement planned to "freeze" the apartment and seek a search warrant. After remaining silent for a few moments, ESTEVAO asked to speak with S/A Higgins. S/A Higgins advised ESTEVAO that he had previously told investigators he wanted a lawyer. At this time, ESTEVAO made a spontaneous utterance and admitted that he had more cocaine within 23C West Bay Road in Osterville, Massachusetts. ESTEVAO indicated that the cocaine was contained within a red bag next to a bed on the second floor of the apartment.

15. Barnstable Police Detectives and ATF Special Agents/Task Force Officers spoke to the mother of ESTEVAO, Ilmara Marshall. Marshall indicated, among other things, that she moved her son Alexander out of Elizabeth, New Jersey. Marshall indicated that she lived in the apartment with her daughter and that ESTEVAO had been living with his fiancé and her family in Wareham, Massachusetts.

16. Law enforcement explained that ESTEVAO was being charged with firearms and ammunition charges as well as the cocaine that was found on his person. Marshall was told that ESTEVAO had indicated he had more cocaine in a red bag within the apartment. Marshall then agreed to sign a Consent to Search form, authorizing law enforcement to retrieve the cocaine and any other illegal articles there. Upon signing this paperwork, Marshall made a copy of the consent to search form.

17. Officers thereafter found a red backpack on the floor at the top of the spiral staircase within

the apartment next to a bed. The backpack contained, among other things, a box of sandwich bags, a digital scale, a bottle of Inositol powder, a Unique Puffs tin containing a green leafy substance, a total of $5,702.00 in U.S. Currency, and a large plastic bag of white powder with a gross weight of approximately 229 grams. The backpack also contained a small package of coiled wick composed of hemp and beeswax, a short length of which could serve as a wick for an explosive device commonly known as a pipe bomb.

18. A sweep conducted by a Massachusetts State Police ("MSP") explosives detection K-9 was negative at the apartment.

19. ESTEVAO was transported to and processed at the Barnstable Police Department, where he was re-read his Miranda Warning on an audio/video recording and stated that he understood his rights. As part of the interview that then occurred, Special Agent Higgins asked if there was a need to worry about whether the white powder contained fentanyl and ESTEVAO indicated that it was composed of cocaine and Inositol.

20. Members of ATF, MSP, the Barnstable Police Department, and the Wareham Police Department then proceeded to 174 Marion Road in Wareham, Massachusetts, to speak to occupants of the residence. Law enforcement officers identified themselves and informed Michael Painter and Tina Linebaugh they wanted to speak about the incident which had occurred involving Domonique Linebaugh and ESTEVAO earlier in the day. It should be noted that the Wareham Police Department stopped Domonique Linebaugh and ESTEVAO in a domestic argument on this same date, an encounter that did not lead to charges. Law enforcement officers informed Pinter and Linebaugh that there had been developments in an investigation of ESTEVAO and that law enforcement was concerned there were potentially dangerous materials present within the residence that should not be there. At this time,

Painter, the owner of the residence, signed a consent to search form limited to the bedroom which had been utilized by ESTEVAO and Domonique Linebaugh.

21. Within minutes of the commencement of the bedroom search, S/A Higgins observed a large black guitar case. Upon removing the guitar contained within the guitar case, S/A Higgins observed two PVC pipes, white in color, each having end caps which appeared to be glued. In the center of each device there was black electrical tape wrapped around the center of the device. At this point, the area of the residence was cleared pending MSP Bomb Squad response and examination of the devices.

22. Linebaugh and Painter were informed of the public safety concern within the bedroom. Special Agent Christopher Kefalas asked Linebaugh to call her daughter (Domonique Linebaugh) to come back to the residence, which she agreed to do.

23. While waiting for the MSP Bomb Squad to arrive on scene, the garage was opened during a voluntary interview of Painter. Plain view observations were made by law enforcement of PVC pipe consistent in appearance with the PVC pipe used in the recovered devices. Law enforcement also observed that the PVC piping within the garage appeared to have been cut at some point in time.

24. Painter indicated that he has resided at 174 Marion Road in Wareham, Massachusetts for approximately 15 years. Painter estimated that Domonique Linebaugh and ESTEVAO moved into the residence around June 1, 2019. Painter said Domonique Linebaugh and ESTEVAO occupied the second floor bedroom located at the top of the stairs to the right, across from Painter's room. Painter said that he did not receive rent from ESTEVAO or Domonique Linebaugh and was unaware if Tina Linebaugh received any money from either. Painter indicated that the bedroom occupied by Domonique Linebaugh and ESTEVAO did

not have a lock, but did have a clasp/hook for an elderly relative that lived there previously. Painter stated that he did not access the aforementioned bedroom. Painter said that Domonique Linebaugh and ESTEVAO have full access throughout the residence. Painter said that Domonique Linebaugh and ESTEVAO had their own door code to the exterior doors of the residence. Painter also stated that he has video surveillance on the garage area and he can see when the garage is accessed, but he cannot be certain that Domonique Linebaugh and ESTEVAO had not entered the garage when he was not present.

25. Upon her arrival at the residence, Domonique Linebaugh was uncooperative with any police questioning and immediately attempted to record law enforcement on a mobile device. She was asked whether she played or owned a guitar or played the guitar and she said "no." Domonique Linebaugh asked for a lawyer and was told she was not in custody and was free to leave at any time. No further investigative questions were asked of Domonique Linebaugh.

26. In a conversation with Painter, law enforcement learned that ESTEVAO was observed by Painter to be sleeping on the couch located on the front porch of the residence at approximately 6:30 a.m. Upon discussing this with law enforcement, Painter allowed law enforcement to expand the search to the area in which ESTEVAO was sleeping. On the porch, law enforcement located black tape appearing to be consistent with the tape located on the devices located in the bedroom utilized by ESTEVAO and Domonique Linebaugh.

27. Upon arrival of the MSP Bomb Technician, the Technician determined that both items were similar in construction and design, consisting of approximately an inch to an inch-and-one-half width poly vinyl chloride, approximately 5-6 inches in length, capped at both ends with the same PVC type of material. The MSP Bomb Technician also observed black electrical tape securing the approximate middle of each suspect device. This construction is consistent

with the design of potential destructive devices utilizing PVC as a containment mechanism.

28. The MSP Bomb Technician, based upon his training, knowledge, and experience and utilizing diagnostic portable X-Ray equipment observed an unknown and unidentified filler secreted within the cavity of each PVC pipe. The Technician also observed a hole in the center of each PVC pipe underneath the black electrical tape. This is also consistent with the construction and design of potential destructive devices. The MSP Bomb Technician also made observations regarding the weight of each individual possible device that indicated that the pipes were not empty.

29. After all observations and X-Rays, the MSP Bomb Technician, in consultation with ATF personnel, agreed that both possible devices would be secured in a ballistic protection bag and removed from the premises. Also agreed upon, was that the items would be exploited at a date, time, and location conducive for proper and safe exploitation of the items.

30. On October 14, 2019, MSP Bomb Technicians rendered both devices safe and conducted a thermal test of a sample of the filler material from each of the devices.   The material ignited. Based on this test and the other examination conducted by the MSP Bomb Technicians, and based my experience and training, I believe the two devices to be explosive devices commonly known as pipe bombs, and therefore to qualify as weapons subject to registration in the National Firearms Registration and Transfer Record.

31. We have consulted with the component of ATF that maintains the National Firearms Registration and Transfer Record and determined that none of the following individuals has any National Firearms Act weapon, including any destructive device, registered to him or her: Alexander ESTEVAO, Michael PAINTER, Tina LINEBAUGH, and Domonique LINEBAUGH. Moreover, no individual has any such weapon registered to him or her at the

Target Location. In addition, we have determined that ESTEVAO is not a licensed dealer in firearms.

32. On October 12, 2019, this Court issued a search warrant authorizing the search of 174 Marion Road in Wareham, Massachusetts. On this same date, ATF Special Agents/Task Force Officers and the Barnstable Police Department executed the search warrant and seized multiple items consistent with possession of a controlled substance with intent to distribute, as well as items consistent with the previously seized explosive devices. The items included baggies with the corners cut off, consistent with a common means of packaging drugs for distribution and consistent with the packaging of the cocaine recovered from ESTEVAO and from the red backpack, found in a black bag in the bedroom in which Estevao had stayed; three digital scales, found on the dresser in the same bedroom; one roll of black electrical tape, found in the porch; two more rolls of black electrical tape, found in two locations in the garage; three pieces of PVC pipe, consistent in appearance with the PVC pipe used in the explosive devices, found in the garage by the roll-down door; three more pieces of PVC pipe consistent in appearance with the PVC pipe used in the explosive devices and which appeared to have been cut, located in the garage by a scroll saw; and an unknown black powder located in a white bucket inside the garage. (While a flame was introduced to a small portion of this powder at the scene and it did not ignite, given that the powder contained in the devices did ignite when the thermal testing was performed, the powder recovered from the garage will be subjected to forensic testing.) Investigators also recovered a digital video recorder, the DVR referred to above, which, according to Painter, recorded individuals who entered the garage and which would also likely depict large items such as PVC pipe that individuals took into the garage.

### Investigators' Possession of the Equipment

33. The mobile phones, which were seized from Estevao incident to his arrest, are currently in the possession of the Barnstable Police Department, and are being stored at its facilities, as described in Attachment A.

34. The DVR system is currently in the possession of ATF, and is being stored at the Bridgewater Field Office, as described in Attachment A. It is more particularly described as a Bunker Hill Security Video Recorder bearing serial number 369471334. Investigators obtained this equipment pursuant to the federal search warrant executed at 174 Marion Road in Wareham, Massachusetts.

### Probable Cause to Believe That The Equipment Contains Evidence, Fruits, And Instrumentalities

35. Based upon the foregoing, there is probable cause to believe that the equipment contains information constituting evidence, fruits, and/or instrumentalities of the crimes of possession of controlled substances with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and/or possession of unregistered destructive devices, in violation of 26 U.S.C. § 5861(d), and/or engaging in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A). The cellular telephones seized pursuant to the arrest of ESTEVAO were located on the person of ESTEVAO while he was in possession of narcotics packaged for distribution. Officers saw him speaking on one of the mobile phones immediately before they approached him. There is probable cause to believe that at this time ESTEVAO was on his way to conduct a drug transaction and that his conversation concerned the transaction. There is additional evidence to show that ESTEVAO was engaged in illegal drug dealing, including the box of sandwich bags, the digital scale, the bottle of Inositol powder, the $5,702.00 in U.S.

Currency, and the large plastic bag of apparent cocaine with a gross weight of approximately 229 grams, all of which was recovered from the red backpack in the defendant's mother's home. In addition, I know based on my training and experience that, in general, it is common for who engage in illegal drug dealing to use mobile phones to contact and speak with their sources of supply and customers, to store the phone numbers of their customers and suppliers, to exchange text messages with their customers and suppliers, and to send, receive, and/or store photographs relating to their drug dealing.

36. With respect to gun trafficking and possession of unregistered pipe bombs, the contact between ESTEVAO and the ATF CW was through both text communication and phone calls, and ESTEVAO used a cell phone to send the CW a photograph of the firearm he ultimately sold. Given that ESTEVAO told the CW that he was able to supply new guns that were still in their boxes, there is reason to believe he had other customers in addition to the CW and was likely communicating with them by means of a cell phone.  ESTEVAO also used a cell phone to speak with the CW on October 10, 2019 about the availability of the two destructive devices. I also know based on my training and experience that, as is the case with drug dealers, individuals who traffic in firearms commonly use mobile phones to contact and speak with their sources of supply and customers, to store the phone numbers of their customers and suppliers, to exchange text messages with their customers and suppliers, and to send, receive, and/or store photographs relating to their gun trafficking.

37. I also know based on my training and experience that it is not unusual for drug dealers and gun traffickers to use more than one cell phone in conducting their business.  Thus, while one of the mobile devices recovered from the defendant is almost certainly the cell phone assigned number (774) 327-4789, there is probable cause to believe that both mobile devices contain

evidence of the crimes discussed above.

38. As discussed above, the DVR recorded the garage area of 174 Marion Road where items of evidentiary value were located. Given the recovery from the garage of items consistent with materials used in making the two pipe bombs, the garage is a possible location in which the devices were manufactured. A search of the DVR will provide information regarding the individuals who accessed the garage, and will likely provide information regarding items, such as PVC pipes, that an individual or individuals brought into the garage.

39. As discussed above, the equipment is currently being stored by investigators at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

40. In general, from my training, experience, and information provided to me by other agents, I am aware that those who engage in the business of dealing firearms without a license frequently use electronic equipment to carry out, communicate about, and store records about their business operations. These tasks are frequently accomplished through sending and receiving business-related e-mail and instant messages; drafting correspondence and other business documents such as spreadsheets and presentations; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money.

41. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

42. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Motorola and Blade phones, such as ESTEVAO's phones, are types of smartphones. Smartphones have capabilities that include serving as wireless telephones, digital cameras, portable media players, GPS navigation devices, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

43. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

44. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years

    at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e. In addition, based on my knowledge, training, and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes. The communication between ESTEVAO and the ATF CW took place over the period of several months and it is believed the search of these devices would corroborate this fact.

## CONCLUSION

45. Based on the information described above, I have probable cause to believe that ESTEVAO has violated 18 U.S.C. § 922 (a)(1)(a), 26 U.S.C. §§ 5861(d), and 21 U.S.C. § 841(a)(1).

46. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the equipment described in Attachment A.

_____
Christopher J. Kefalas
Special Agent, ATF

Subscribed and sworn to before me this 27th day of November, 2019.

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Description of Equipment to Be Searched

The equipment to be searched consists of the following:

One Bunker Hill Security Video Recorder bearing serial number 369471334.

The equipment is located at the office of the Bureau of Alcohol, Tobacco, Firearms and Explosives, 1 Lakeshore Center – 2nd Floor, Bridgewater, Massachusetts, in the evidence storage facility.

## ATTACHMENT B

### Items to Be Seized

I. All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 26 U.S.C. § 5861(d), including those related to:

    A. The following topics:

        1. Images of any individuals gaining access to the garage located at 174 Marion Road, Wareham, Massachusetts, during the period from September 11, 2019 to and including October 11, 2019;

        2. Images of any items being brought into or taken into the garage located at 174 Marion Road, Wareham, Massachusetts, during the period from September 11, 2019 to and including October 11, 2019, including but not limited to PVC pipe;

        3. Images of any items being brought out of or removed from the garage located at 174 Marion Road, Wareham, Massachusetts, during the period from September 11, 2019 to and including October 11, 2019.

    B. Evidence of who used, owned, or controlled the equipment;

    C. Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

    D. Evidence of the attachment of other hardware or storage media;

    E.    Evidence of counter-forensic programs and associated data that are designed to eliminate data;

    F.    Evidence of the times the equipment was used;

    G.    Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

    H.    Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media; and

    I.    Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators.

II.    Serial numbers and any electronic identifiers that serve to identify the computer equipment.

## DEFINITIONS

For the purpose of this warrant:

    A.    "Equipment" means any hardware, software, storage media, and data.

    B.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C. "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.